[739 NYS2d 67]

In the Matter of JOSEPH F. MUTO (Admitted as JOSEPH FRANCIS MUTO), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, March 19, 2002

### APPEARANCES OF COUNSEL

*Sherry K. Cohen* of counsel (*Thomas J. Cahill,* attorney), for petitioner.

*Joseph F. Muto,* respondent pro se.

### OPINION OF THE COURT

Per Curiam.

Respondent Joseph F. Muto was admitted to the practice of

law in the State of New York by the Third Judicial Department on January 27, 1987, as Joseph Francis Muto. Respondent is also admitted to practice in Colorado. At all times relevant to the charges here at issue, respondent maintained an office for the practice of law within the First Judicial Department.

On or about February 27, 2001, petitioner Departmental Disciplinary Committee (DDC) served respondent with a notice and statement of charges charging respondent with 43 counts of professional misconduct in connection with his immigration law practice. Thirty-six of the charges relate to respondent's alleged neglect of matters in which he represented 17 clients in proceedings before the United States Immigration Court. The remaining charges are based on respondent's alleged violations of trust account rules in connection with two IOLA accounts, and his alleged failure to comply with the address reporting requirements of the Office of Court Administration (OCA). It is charged that these alleged acts of respondent constituted violations of several Disciplinary Rules of the Code of Professional Responsibility, to wit: DR 1-102 (a) (4), (5) and (7) (22 NYCRR 1200.3) (conduct involving dishonesty, fraud, deceit or misrepresentation, prejudicial to the administration of justice, and adversely reflecting on one's fitness to practice law); DR 3-101(a) (22 NYCRR 1200.16) (aiding the unauthorized practice of law); DR 6-101 (a) (2) and (3) (22 NYCRR 1200.30) (handling a legal matter without adequate preparation under the circumstances and neglect of a legal matter); DR 7-101 (a) (1) and (3) (22 NYCRR 1200.32) (failing to seek a client's lawful objectives and intentionally prejudicing or damaging a client during the course of representation); DR 7-106 (a) (22 NYCRR 1200.37) (disregarding a ruling of a tribunal); and DR 9-102 (a), (b), (c) (4), (d), (e), (i) and (j) (22 NYCRR 1200.46) (improper commingling of trust funds; improper maintenance of a trust account; failing to promptly deliver property a client is entitled to receive; failing to keep proper bookkeeping records and to produce such records as required by law; writing a check payable to "cash" from an IOLA account). Respondent filed an answer, dated March 23, 2001, denying all charges.

In June 2001, seven days of hearings were held before Referee John Horan, Esq. The DDC staff called 12 witnesses. Respondent, who appeared pro se at the hearing, testified on his own behalf. The Referee, who credited testimony of the DDC witnesses and discredited most of respondent's testimony,

sustained each of the 43 charges and recommended the sanction of disbarment. A Hearing Panel of the DDC heard oral argument on November 8, 2001, and subsequently issued a report, dated November 19, 2001, unanimously confirming the Referee's findings of fact and conclusions of law, and concurring in the Referee's recommendation that respondent be disbarred. The DDC now moves for an order pursuant to 22 NYCRR 603.4 (d), confirming the findings of fact and conclusions of law of the Referee and the Hearing Panel, and imposing the sanction of disbarment.

After reviewing the record, we agree that all 43 charges against respondent were properly sustained, and that the sanction of disbarment should be imposed. Since 1997, respondent has purported to specialize in representing illegal immigrants, chiefly from China, who seek political asylum in the United States. Through the testimony of several of respondent's former clients and attorneys familiar with these matters, the DDC staff showed that these immigrants are brought into the United States by a series of middlemen known as "snakeheads," who hand the immigrants over to an "agency" when they reach their destination in this country. The immigrant, lacking any knowledge of either the English language or the American legal system, then becomes completely dependent on his "agency," which provides him with a job, a place to sleep, translators, and legal representation in immigration matters. The nonlawyer "agency" generally performs the actual legal work, and retains an attorney to front for it in the Immigration Court. An attorney retained by an "agency" to represent an illegal immigrant client generally has little or no contact with the client, exercises no control over the case, and serves at the pleasure of the "agency," which pays his fee. The Referee concluded that respondent lent himself to this "insidious system."

Based on the testimonial and documentary evidence presented by the DDC staff, the Referee made findings, confirmed by the Hearing Panel, that respondent engaged in the following kinds of professional misconduct, among others, in representing 17 immigrant clients:

(1) accepting client referrals from nonlawyers, and relying on nonlawyers he did not supervise to perform legal work, such as consulting with the client;

(2) in most cases, undertaking the representation without ever discussing the case directly with the client in the presence of a translator, and, in some cases, without ever meeting the client at all;

(3) filing with the courts affidavits purportedly signed by clients, which the clients in fact had not signed;

(4) repeatedly failing to appear at hearings in violation of court directives that he appear, and after giving the courts assurances that he would appear;

(5) filing grossly inadequate and/or untimely motions to change venue or to reopen orders of deportation, which motions were denied;

(6) failing to file motions after his office represented to the clients that such motions would be made;

(7) failing to advise clients of hearing dates, or having his office advise clients that it was unnecessary for them to appear at scheduled hearings, and failing to advise clients of dispositions of motions of which they should have been apprised, such as motions for change of venue;

(8) arranging for other attorneys to appear in his stead at hearings, without informing the clients or obtaining their consent, and without adequately preparing the other attorneys for such appearances; and

(9) failing to return important original documents relating to a client's asylum claim.

In addition, the Referee found that respondent made affirmative misrepresentations to the Immigration Courts and to the DDC in order to conceal his professional misconduct, in a number of cases seeking to blame the client for his own professional failures. Notably, although respondent's neglect resulted in the entry of orders of deportation against the clients who testified in this proceeding, those clients were able to salvage their cases by retaining, at higher cost, new attorneys who made successful motions to reopen.

The Referee also found that respondent engaged in the following misconduct relating to his trust accounts: (1) he wrote a check payable to "cash" from one of his IOLA accounts; (2) he failed to keep and produce to the DDC proper bookkeeping records for that account or a second IOLA account; (3) he accepted a $30,000 check from an individual for deposit in one IOLA account, which funds purportedly belonged to an unnamed third party, and disbursed the funds in cash to the individual who gave him the check without knowing or seeking to know the unnamed third party; and (4) he used one IOLA account solely as a business operating account. Finally, the Referee found that respondent failed to report his correct business address in two OCA registration statements.

To the extent respondent sought to deny the charges or to excuse his admitted misconduct, the Referee found his testimony incredible. Like the Hearing Panel, we see no reason to disturb this finding.*

In support of his argument that his punishment should be limited to public censure or reprimand, respondent proffers two points as supposed mitigation of his misconduct. First, he points out that during the period at issue in some of the charges, his mother had been terminally ill in Syracuse, requiring him to travel there frequently up to the time of her death in February 1999. As the Hearing Panel noted, however, respondent failed to demonstrate any causal connection between his mother's illness and his professional misconduct. Second, respondent asserts that his failures to appear for hearings in New Orleans (the venue of a number of his clients' cases) should be deemed excused due to his fear of flying. Respondent claims that each time he arranged to travel to New Orleans, he believed he would be able to board the airplane, but he ultimately was unable to do so. We agree with the Referee and the Hearing Panel that, under the circumstances of this case, the matter of respondent's fear of flying is more aggravating than it is mitigating. Respondent, in spite of his awareness that he suffered from this condition, not only took on matters involving hearings in a distant city, he failed to advise his clients of the risk that he would be unable to appear at such hearings due to his disability.

While genuinely mitigating factors are absent, aggravating factors are clearly present. In this connection, it is significant that respondent had accumulated a substantial disciplinary history before any of the events on which the present charges are based. On December 23, 1994, the Fourth Department suspended him, on default, pending further proceedings (*Matter of Muto*, 210 AD2d 1008), and on December 22, 1995, that Court suspended him for one year from the date of his interim suspension, and until further order of the Court, for neglect and use of client funds for personal purposes (*Matter of Muto*, 218 AD2d 328). Before respondent was reinstated to the bar on December 30, 1996 (*Matter of Muto*, 234 AD2d 1014), the Fifth District Grievance Committee issued a letter of admonition to him in March 1996, based on 10 different client complaints of neglect predating his suspension. Respondent's culpability is

---

* Respondent challenges only two of the 43 charges against him as based on insufficient evidence. We agree with the Hearing Panel that the charges in question were supported by sufficient evidence.

further aggravated by his lack of candor in these proceedings, and by his lack of genuine remorse and contrition, as evidenced by his continued mantra-like recitation, even in this Court, of the baseless assertion that he rendered "low cost high quality" representation to his ill-served clients. As the Referee observed, respondent's repetition of this empty claim "has an air of delusion about it."

In sum, we confirm the findings of fact and conclusions of law sustaining all 43 charges against respondent. Further, we agree with the Referee and the Hearing Panel that disbarment is the appropriate sanction in this case. As aptly noted by the Referee, respondent's conduct demonstrates a "truly shocking disregard for his clients' welfare in what is for them one of the most important undertakings of their lives." Respondent, who already has a substantial disciplinary history based on neglect of client matters during an earlier period of his career, has been proven in this proceeding to have neglected the representation of no less than 17 clients in matters of the gravest significance, involving possible loss of their personal liberty and deportation. Through this "long-standing pattern of insensitivity to his legal and ethical obligations, * * * respondent has shown himself to be unfit to continue in the practice of law" (*Matter of Hunter*, 120 AD2d 214, 220; *see also, Matter of Evangelista*, 233 AD2d 1; *Matter of Kranis*, 219 AD2d 278, *lv denied* 89 NY2d 805; *Matter of Stenstrom*, 194 AD2d 277). In the words of the Hearing Panel, respondent "is a danger to any client who might retain him." The protection of the public demands that respondent be removed from the legal profession.

Accordingly, the petition of the DDC for an order pursuant to 22 NYCRR 603.4 (d) should be granted, the findings of fact and conclusions of law of the Referee and the Hearing Panel confirmed, and respondent disbarred from the practice of law in this state and his name stricken from the roll of attorneys and counselors-at-law, effective immediately.

NARDELLI, J.P., SAXE, SULLIVAN, WALLACH and FRIEDMAN, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective the date hereof.